**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SUSANNE GIONET,<br><br>                              *Plaintiff*,<br><br>       v.<br><br>NANCY PELOSI, et al.,<br><br><br><br>                              *Defendants*. | No. 1:22-cv-00610-CJN |

## CONGRESSIONAL DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants the Honorable Nancy Pelosi, the Honorable Bennie G. Thompson, the Honorable Elizabeth L. Cheney, the Honorable Adam B. Schiff, the Honorable Jamin B. Raskin, the Honorable Susan E. Lofgren, the Honorable Elaine G. Luria, the Honorable Peter R. Aguilar, the Honorable Stephanie Murphy, the Honorable Adam D. Kinzinger, the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol, John Wood, and Timothy J. Heaphy[1] ("Congressional Defendants") respectfully move for an order dismissing Plaintiff's Complaint (Mar. 4, 2022) (ECF No. 1).  For the reasons set forth in the accompanying Memorandum of Points and Authorities, the Complaint should be dismissed with prejudice.

A proposed order is attached.

---

[1] Mr. Heaphy is a Select Committee staff counsel; Mr. Wood is a former staff counsel.  As staff counsels, neither has or had subpoena authority.  Counsel for Congressional Defendants emailed Plaintiff's counsel to ask that Plaintiff voluntarily dismiss Mr. Heaphy and Mr. Wood, but has not received a response.

Respectfully submitted,

/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte[*]
Noam Biale
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

August 31, 2022

* Appearing pursuant to 2 U.S.C. § 5571(a).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSANNE GIONET,

*Plaintiff*,

v.

NANCY PELOSI, et al.,

*Defendants*.

No. 1:22-cv-00641-CJN

## CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW
## <u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 1

    A.    The January 6th Attack and Anthime Gionet ........................................ 1

    B.    The Formation of the Select Committee ................................................ 4

    C.    The Select Committee's Subpoena to Verizon ...................................... 5

STANDARD OF REVIEW ......................................................................................... 6

ARGUMENT ........................................................................................................... 6

I.    The Select Committee Was Authorized to Issue the Subpoena ........................................ 6

II.    The Subpoena Serves a Legislative Purpose and Is Not Overly Broad ........................... 13

III.    The Subpoena Does Not Violate the First Amendment .................................................... 14

IV.    The Subpoena Does Not Violate the Fourth Amendment ................................................. 17

V.    The Subpoena Does Not Violate Attorney-Client Privilege ............................................... 19

VI.    The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from Verizon Pursuant to a Lawful Subpoena ............................................................................................. 20

CONCLUSION ...................................................................................................... 23

i

## TABLE OF AUTHORITIES

<u>Cases</u>

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................6

*\*Barenblatt v. United States,*
  360 U.S. 109 (1959) ..............................................................................................15

*Barker v. Conroy,*
  921 F.3d 1118 (D.C. Cir. 2019) ..............................................................................6

*Barry v. U.S. ex rel. Cunningham,*
  279 U.S. 597 (1929) ................................................................................................7

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................6

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO,*
  860 F.2d 346 (9th Cir. 1988) ................................................................................16

*Brown v. Sprint Corp. Sec. Specialist,*
  2019 WL 418100 (E.D.N.Y. Jan. 31, 2019) ..........................................................18

*\*Buckley v. Valeo,*
  424 U.S. 1 (1976) .......................................................................................15, 16, 17

*Budowich v. Pelosi,*
  No. 21-3366 (D.D.C. Jan. 20, 2022) ......................................................................10

*Burnap v. United States,*
  252 U.S. 512 (1920) ..............................................................................................22

*\*Carpenter v. United States,*
  138 S. Ct. 2206 (2018) ................................................................................17, 18, 19

*Cause of Action Inst. v. United States Dep't of Just.,*
  330 F. Supp. 3d 336 (D.D.C. 2018) ......................................................................19

*Digit. Realty Tr., Inc. v. Somers,*
  138 S. Ct. 767 (2018) ............................................................................................20

*Dir. of Off. of Thrift Supervision v. Ernst & Young,*
  795 F. Supp. 7 (D.D.C. 1992) ................................................................................20

*\*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975) ....................................................................................14, 16, 17

*Eastman v. Thompson,*
  No. 22-99 (C.D. Cal.) ..................................................................................10, 12, 17

*Hubbard v. United States,*
  514 U.S. 695 (1995) ..............................................................................................21

*McGrain v. Daugherty*,
  273 U.S. 135 (1927) ................................................................................13

*McPhaul v. United States*,
  364 U.S. 372 (1960) ..........................................................................17, 19

*Quinn v. United States*,
  349 U.S. 155 (1955) ................................................................................13

*Rangel v. Boehner*,
  20 F. Supp. 3d 148 (D.D.C. 2013) ...........................................................7

*Republican Nat'l Comm. v. Pelosi*,
  --- F. Supp. 3d ---, 2022 WL 1294509 (D.D.C. May 1, 2022) ......10, 11, 12, 13, 19

*\*Senate Permanent Subcomm. v. Ferrer*,
  199 F. Supp. 3d 125 (D.D.C. 2016) ........................................................15

*Smith v. Maryland*,
  442 U.S. 735 (1979) ................................................................................17

*Trump v. Deutsche Bank AG*,
  943 F.3d 627 (2d Cir. 2019) ...................................................................22

*Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 (2020) .....................................................................13, 22

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ...............................................................2, 16

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) ................................................................11

*United States v. Bannon*,
  No. 21-670 (D.D.C.) ....................................................................10, 11, 13

*United States v. Beverly*,
  943 F.3d 225 (5th Cir. 2019) ..................................................................18

*United States v. Chem. Found., Inc.*,
  272 U.S. 1 (1926) ......................................................................................7

*United States v. Rostenkowski*,
  59 F.3d 1291 (D.C. Cir. 1995) ............................................................7, 11

*United States v. Searcy*,
  2021 WL 3616062 (W.D. Pa. Aug. 16, 2021) ........................................18

*Vander Jagt v. O'Neill*,
  699 F.2d 1166 (D.C. Cir. 1982) ...............................................................7

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................16

*Wolff v. McDonnell*,
  418 U.S. 539 (1974) ................................................................................15

Constitution & Statutes

U.S. Const., Art. I, § 5, cl. 2 ................................................................................6

18 U.S.C. § 6 .........................................................................................................21

18 U.S.C. § 1001 ...................................................................................................21

18 U.S.C. §§ 2701 *et seq.* ...................................................................................20
    18 U.S.C. § 2702 ......................................................................................20, 23
    18 U.S.C. § 2711 ..............................................................................................20
    18 U.S.C. § 2712 ..............................................................................................22

26 U.S.C. §§ 8001-05 ............................................................................................7

Legislative Sources

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) ....................................................8

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) .....................................................8, 11

167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) ....................................................9

167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) ...........................................10

167 Cong. Rec. H7786 (daily ed. Dec. 14, 2021) ...................................................9

167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ...................................................9

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) ...........................................10

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) .....................................................9

168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) .............................................10

H. Rep. No. 109-377 (2006) ....................................................................................8

H. Res. 6, 116th Cong. (2019) ...............................................................................12

H. Res. 24, 110th Cong. (2007) .............................................................................12

H. Res. 437, 109th Cong. (2005) .............................................................................8

H. Res. 503, 117th Cong. (2021) ...........................................1, 4, 8, 9, 11, 12, 13, 14, 17

H. Res. 730, 117th Cong. (2021) .............................................................................9

H. Res. 851, 117th Cong. (2021) .............................................................................9

H. Res. 1037, 117th Cong. (2022) ...........................................................................9

Rules of the U.S. House of Representatives, 117th Cong. (2021)
    Rule I ..........................................................................................................8, 11
    Rule X ...............................................................................................................7

Other Authorities

8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172 ....................11

Aaron R. Cooper, *Congressional Surveillance*,
    70 Am. U. L. Rev. 1799 (2021) .....................................................................22

iv

Anthime Gionet, *Baked Alaska January 6 D.C. Capitol Livestream* (Jan. 6, 2021),
    https://perma.cc/7KGG-X6HQ ............................................................................2

Barton Gellman, *The Election That Could Break America*,
    The Atlantic (Sept. 23, 2020), https://perma.cc/HW2H-YM5Q.............................13

Black's Law Dictionary (11th ed. 2019).......................................................................12

*Far-right's 'Baked Alaska' gets 30 days in jail over assault*, Associated Press
    (Jan. 13, 2021), https://perma.cc/6XLG-KL4G ....................................................2

Kellen Browning and Taylor Lorenz, *Pro-Trump Mob Livestreamed Its Rampage,
    and Made Money Doing It*, N.Y. Times (Jan. 8, 2021),
    https://perma.cc/9542-CM4X ...............................................................................2

Michelle Theriault Boots, *He went from a childhood in Anchorage to alt-right fame.
    Now, the social media personality known as Baked Alaska has been arrested
    for storming the U.S. Capitol.,* Anchorage Daily News (Jan. 16, 2021),
    https://perma.cc/6SSG-5VBP ...............................................................................2

Oliver Darcy, *The untold story of Baked Alaska, a rapper turned BuzzFeed
    personality turned alt-right troll*, Business Insider (Apr. 30, 2017), https://perma.cc/57QP-
    ZSA3 ...................................................................................................................2

Press Release, Kevin McCarthy, House of Representatives,
    McCarthy Statement about Pelosi's Abuse of Power on Jan. 6th Select Comm.
    (July 21, 2021), https://perma.cc/4JNC-73R2 .......................................................5

Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican
    Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the
    U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA....................................4

## INTRODUCTION

Anthime "Baked Alaska" Gionet, a prominent far-right social media figure, entered the Capitol illegally on January 6th, and broadcast his participation in the riot over the Internet to thousands. His mother is trying to block a subpoena issued by the House Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee) to Verizon seeking subscriber information, connection records, and records of session times and durations of calls from November 1, 2020, through January 31, 2021, for phone numbers associated with him. Supreme Court and D.C. Circuit precedent, along with long-established constitutional principles, compel rejection of her claims.

*First*, the Select Committee was authorized to issue the subpoena. *Second*, the subpoena serves a valid legislative purpose and is not overly broad. *Third*, the subpoena does not violate the First Amendment. *Fourth*, the subpoena does not violate the Fourth Amendment. *Fifth*, the subpoena does not violate attorney-client privilege. *Sixth*, the subpoena does not violate the Stored Communications Act.

In short, the Complaint here presses a variety of flawed legal claims designed to thwart the Select Committee's efforts to understand fully, and to recommend measures to prevent a recurrence of, the events of January 6th. This Court should dismiss the Complaint in its entirety.

## BACKGROUND

### A.    The January 6th Attack and Anthime Gionet

On January 6, 2021, violent rioters seeking to thwart the peaceful transfer of power following the 2020 Presidential election launched an assault on the United States Capitol. H. Res. 503, 117th Cong. (2021), Preamble. Rioters attacked police, breached the Capitol, and obstructed and impeded the electoral count. The attack on the Capitol ultimately "left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the

Capitol." *Trump v. Thompson*, 20 F.4th 10, 15 (D.C. Cir. 2021).  Law enforcement eventually cleared the rioters from the Capitol, and the electoral count resumed later that night after a nearly six-hour delay.

Anthime Gionet, also known as "Baked Alaska," has been described as a "[f]ar-right social media personality"[2] and "one of the de-facto leaders of the alt-right meme army" who at one point had approximately 160,000 people following his social media activity.[3]  In 2017, he was reportedly billed as a featured speaker at the "Unite the Right" rally in Charlottesville, Virginia.[4]  He is the son of Plaintiff Susanne Gionet and shared her family telephone plan.  *See* Compl. ¶ 4.

On January 6th, Mr. Gionet entered the U.S. Capitol while knowing he was not authorized to do so.[5]  While inside, he broadcast the ongoing attack live over the Internet for approximately 27 minutes.[6]  His broadcast reportedly had more than 16,000 viewers and, according to estimates, earned him more than $2,000.[7]

---

[2] *Far-right's 'Baked Alaska' gets 30 days in jail over assault*, Associated Press (Jan. 13, 2021), https://perma.cc/6XLG-KL4G.

[3] Oliver Darcy, *The untold story of Baked Alaska, a rapper turned BuzzFeed personality turned alt-right troll*, Business Insider (Apr. 30, 2017), https://perma.cc/57QP-ZSA3.

[4] Michelle Theriault Boots, *He went from a childhood in Anchorage to alt-right fame. Now, the social media personality known as Baked Alaska has been arrested for storming the U.S. Capitol.*  Anchorage Daily News (Jan. 16, 2021), https://perma.cc/6SSG-5VBP.

[5] Statement of Offense ¶¶ 8, 14, *United States of America v. Anthime Joseph Gionet*, No. 22-cr-132 (D.D.C. July 22, 2022), ECF No. 64, https://perma.cc/NH4M-LGQL.

[6] *See id.* ¶ 8; Anthime Gionet, *Baked Alaska January 6 D.C. Capitol Livestream* (Jan. 6, 2021), https://perma.cc/7KGG-X6HQ.

[7] Kellen Browning and Taylor Lorenz, *Pro-Trump Mob Livestreamed Its Rampage, and Made Money Doing It*, N.Y. Times (Jan. 8, 2021), https://perma.cc/9542-CM4X.

While inside the Capitol, Mr. Gionet encouraged rioters by chanting slogans and making statements including "Let's go, 1776," "Fight for Trump," "Let's go, America First," "We [a]re the Kraken, unleash the Kraken," "[T]rust the fucking plan, let's go," and "This was a fraudulent election, we're standing up for the truth, God's truth."[8]   He also encouraged rioters to enter the Capitol, stating "Come in, let's go, come on in, make yourselves at home."[9]   While in a Senator's office inside the Capitol building, Mr. Gionet declared, "America First is inevitable, let's go, fuck globalists, let's go."[10]   He then entered another office and exclaimed "Occupy the Capitol, let's go, we ain't leaving this bitch" and "Patriots are in control."[11]

When law enforcement ultimately ushered Mr. Gionet toward a Capitol exit, he accused a United States Capitol Police officer of shoving him.  He yelled at the officer, "You're a fucking oathbreaker, you piece of shit, fuck you, fuck you, fuck you, you piece of shit, you broke your oath to the Constitution, fuck you."[12]

On July 22, 2022, Mr. Gionet pleaded guilty to a one-count Information charging him with "Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G)."[13]   He signed a "Statement of Offense as a written proffer of evidence, along with [a plea] Agreement."[14]

---

[8] Statement of Offense ¶ 10, *United States of America v. Anthime Joseph Gionet*, No. 22-cr-132 (D.D.C. July 22, 2022), ECF No. 64, https://perma.cc/NH4M-LGQL.

[9] *Id.* ¶ 11.

[10] *Id.* ¶ 12.

[11] *Id.*

[12] *Id.* ¶ 13.

[13] Plea Agreement at 1, *Gionet*, No. 22-cr-132 (D.D.C. July 22, 2022), ECF No. 63, https://perma.cc/6289-6W66

[14] *Id.* at 2; *see* Statement of Offense at 6, *Gionet*, No. 22-cr-132 (D.D.C. July 22, 2022), ECF No. 64, https://perma.cc/NH4M-LGQL.

### B.      The Formation of the Select Committee

In response to the unprecedented attack on January 6th, the House of Representatives adopted House Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol."  H. Res. 503 § 1.  The resolution authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol" and "relating to the interference with the peaceful transfer of power"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures . . . as it may deem necessary."  H. Res. 503 §§ 3(1), 4(a)(1)-(3).

To carry out those functions, House Resolution 503 authorizes the Speaker of the House to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader."  H. Res. 503 § 2(a).  Consistent with the Resolution, the Speaker initially appointed seven Democrats and one Republican and then consulted with the House Minority Leader, who recommended five additional Republicans.[15]  The Speaker then spoke with the Minority Leader, advised that she would appoint three of those he had recommended, and asked the Minority Leader to recommend two other Republicans.[16]  After the Minority Leader declined to do so and, instead, withdrew all five of his recommendations, the

---

[15] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA.

[16] *Id.*

4

Speaker named an additional Republican to the Select Committee.[17]  Since then, the Select Committee has functioned with seven Democrats and two Republicans.

### C.   The Select Committee's Subpoena to Verizon

In furtherance of its duty to investigate the facts, circumstances, and causes of the attack on January 6th, the Select Committee has issued subpoenas to various government agencies, private companies, and certain individuals.  The Select Committee served Verizon with a subpoena seeking subscriber information, connection records, and records of session times and durations of calls for the period of November 1, 2020, through January 31, 2021, for phone numbers associated with Mr. Gionet.  As noted in the Schedule that accompanied the subpoena, Section A of which is attached to this Memorandum as Exhibit A, the subpoena "does not call for the production of the content of any communications[.]"

Ms. Gionet, who alleges that she is the subscriber for the family plan account that includes the subpoenaed phone numbers, filed this case on March 4, 2022.  ECF No. 1.  She asks this Court to declare that the Verizon subpoena is "unlawful and therefore unenforceable"; "serve[s] no valid legislative purpose and exceeds the Select Committee's lawful authority"; "violate[s] Anthime Gionet's attorney-client privilege"; and "violate[s] Mrs. Gionet's Due Process right to privacy protected by the Fourth Amendment."  Compl. Prayer for Relief ¶¶ a-c, e.  Ms. Gionet also seeks a "declaratory judgment" that "compliance with the Subpoena would violate the Stored Communications Act"; "if the committee has any information or other subpoenas that information must be made available to opposing counsel"; and "the committee must reveal how they received the number they seek to subpoena information for."  *Id.* ¶¶ d, f-g.

---

[17] *See* Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on Jan. 6th Select Comm. (July 21, 2021), https://perma.cc/4JNC-73R2.

Ms. Gionet also asks this Court to issue an injunction "quashing the Subpoenas and prohibiting Verizon from producing any data requested by the Select Committee"; "prohibiting the Select Committee from reviewing, inspecting, storing, or disclosing any data already submitted and requiring the return of such data if it so exists"; and "prohibiting Defendants from imposing sanctions on either Mrs. Gionet or Verizon for noncompliance with the Subpoena." *Id.* ¶¶ h-j.  Finally, she seeks an award for expenses, including attorneys' fees and costs.  *Id.* ¶ k.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), Ms. Gionet must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

Ms. Gionet's various legal theories are incorrect, and this suit should be dismissed.

## I.      The Select Committee Was Authorized to Issue the Subpoena

Ms. Gionet alleges that the Select Committee lacked authority to issue the subpoena to Verizon for her phone records.  *See* Compl. ¶¶ 62-69.  She is wrong.

Ms. Gionet's demand that this Court override the actions of the House and its Speaker for assertedly not following the Select Committee's authorizing resolution violates Constitutional separation of powers principles.  The Constitution's Rulemaking Clause states that "[e]ach House may determine the Rules of its Proceedings."  U.S. Const., Art. I, § 5, cl. 2.  It is settled law in this Circuit that the Clause "'clearly reserves to each House of the Congress the authority to make its own rules,' and . . . interpreting a congressional rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.'"  *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019)

(quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013) (noting that the Rulemaking Clause provides exclusive power to Congress to "make its own rules about its internal proceedings"). As the D.C. Circuit has explained, it is a "startlingly unattractive idea, given our respect for a coequal branch of government, for us to tell the Speaker" whom to appoint to committees. *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1176 (D.C. Cir. 1982) (internal quotation marks and citation omitted).

In addition, decisions by Congress interpreting its own rules are entitled to the "presumption in favor of regularity" that all government officials enjoy. *Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity . . . cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority."). None of the allegations in the Complaint comes close to demonstrating the "clear evidence to the contrary" required to overcome that presumption. *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926).

Regardless, even if this Court considers her arguments, Ms. Gionet's challenges to the Select Committee's composition and subpoena authority are deeply flawed.

*First*, Ms. Gionet contends that Speaker Pelosi's appointment of nine members to the Select Committee was not consistent with the authorizing resolution of the Select Committee because "the resolution requir[es] 13 members." Compl. ¶ 65. She is incorrect.

By way of background, the House has four different kinds of committees, each of which is established and governed by various House Rules, statutes, and House resolutions, or on an *ad hoc* basis. *See, e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021) (House Rules) (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing the

Joint Committee on Taxation); H. Res. 503 § 1 (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) (appointment of conferees for H.J. Res. 31).  The House rules and procedures governing appointments to these four distinct types of committees vary. Significantly, under House rules, the Speaker appoints Members for all select committees, including the one at issue here.  *See* House Rule I.11 ("The Speaker shall appoint all select, joint, and conference committees ordered by the House.").  And, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House."  *See* 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (statement of Rep. Hoyer).

Ms. Gionet's attack on the composition of the Select Committee fails.  House Resolution 503 states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader."  H. Res. 503 § 2(a).  The Resolution does not require that *all* thirteen Members be appointed for the Select Committee to function, and the Congressional Defendants are aware of no rule or law providing that the authorization to appoint thirteen Members required that the Speaker appoint that precise number.

Indeed, interpretation of House rules is strongly informed by prior practice, and precedent supports a House select committee operating with fewer than its full allotment of Members. Specifically, in the 109th Congress, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty members, using language substantially similar to the Resolution here.  *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee shall be composed of 20 members appointed by the Speaker[.]"). Then-House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the then-majority Republican Party.  *See* H. Rep. No. 109-377, at ii (2006) (listing Members). Notably, that select committee likewise issued subpoenas.  *See id.* at 23 (noting that the Katrina

Select Committee issued a subpoena to the Department of Defense, and that the Department complied). This precedent strongly supports the Speaker's actions here.

Moreover, House Resolution 503 contemplates the possibility of "vacancies," but provides no specific timeline for filling them. *See* H. Res. 503 § 2(c). Nor does House Resolution 503 provide that the Select Committee would become invalid, or that it must suspend all action, should a vacancy occur—even though, by definition, it would have fewer than thirteen members. *See id.*

Indeed, the full House affirmatively ratified the relevant actions of the Select Committee in the face of challenges on the House floor identical to the challenges Ms. Gionet raises here. For example, when the full House debated the resolutions recommending referral of Stephen Bannon, Mark Meadows, Peter Navarro, and Daniel Scavino, Jr. for contempt of Congress for failure to comply with Select Committee subpoenas, several Members of Congress raised the argument about the composition of the Select Committee.[18] The full House nonetheless approved the Select Committee's referrals of those four individuals for contempt of Congress.[19]

---

[18] *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ("This committee is illegitimate. It has violated its own rules of creation. It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6. You can't have a committee to find out what happened because you are interested. You can't do that. And that is what they are doing today.") (statement of Rep. Biggs); *id.* at H7786 (contending that the Select Committee does not comply with House Resolution 503 because "the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members") (statement of Rep. Banks); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (specifically raising challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and Daniel Scavino, Jr.); 167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) (arguing, in debate on the contempt resolution for Stephen Bannon, that "the subpoenas that have so far been issued do not ask for information that would meet any legitimate legislative purpose") (statement of Rep. Banks).

[19] *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino). These resolutions were

The interpretive arguments Ms. Gionet now presents have thus been rejected by the Select Committee, the Rules Committee, the House Parliamentarian, the Speaker, and the full House of Representatives.  The full House's ratification of the referrals reinforces that Ms. Gionet's objections to the Select Committee's composition cannot be accepted.

It is thus no surprise that every district court to have considered Ms. Gionet's argument—including this one—has rejected it.  As Judge Kelly of this district recently explained, "the House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution, even though the Select Committee has only nine members.  This understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas." *Republican Nat'l Comm. ("RNC") v. Pelosi*, No. 22-659, --- F. Supp. 3d. ---, 2022 WL 1294509, at *15 (D.D.C. May 1, 2022), *appeal pending*, No. 22-5123 (D.C. Cir.).

In *United States v. Bannon*, No. 21-670 (D.D.C.), this Court reached the same conclusion.  *See* Mot. Hr'g Tr. at 114:9-116:9 (June 15, 2022); Mot. Hr'g Tr. at 130:22-131:24 (July 11, 2022).[20]  In rejecting the argument that House rules mandated that the Speaker appoint exactly thirteen Members to the Select Committee, this Court explained that "the fact that House Resolution 503 uses the word 'shall' is not conclusive to proving that 13 members are required for the Select Committee to lawfully operate."  Mot. Hr'g Tr. at 115:4-6 (June 15, 2022).  Given

---

reported by the Select Committee, approved for floor consideration by the House Rules Committee and approved by the full House.  *See* 167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) (vote on Bannon); 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on Meadows); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) (vote on Navarro and Scavino).

[20] In addition, before the decision in *RNC*, two other district courts had reached the same conclusion.  *See* Oral Arg. Tr. at 34, *Budowich v. Pelosi*, No. 21-3366 (D.D.C. Jan. 20, 2022), ECF No. 27; Order Den. Pl.'s Mot. for Prelim. Inj. at 9 n.12, *Eastman v. Thompson*, No. 22-99 (C.D. Cal. Jan. 25, 2022), ECF No. 43.

the "potential ambiguity" in the rule, this Court determined that it "must give great weight to the interpretation of those House members charged with implementing the resolution and to the House itself," *id.* at 115:8-10, because "judicial interpretation of an ambiguous House Rule runs the risk of the Court intruding into the sphere of influence reserved to the legislative branch under the Constitution," *id.* at 116:3-5 (quoting *Rostenkowski*, 59 F.3d at 1306); *see also RNC*, 2022 WL 1294509, at *15.  Mr. Bannon was subsequently convicted on two counts of contempt of Congress.  *See* Verdict Form, ECF No. 135 (July 22, 2022).

   *Second*, Ms. Gionet complains that, although the authorizing resolution states that certain members of the Select Committee are to be appointed "after consultation with the minority leader," Compl. ¶ 63 (quoting H. Res. 503 § 2(a)), "Speaker Pelosi failed to ever consult with the Minority Leader Kevin McCarthy" before making the appointments, *id.* ¶ 66.

   But the power to appoint Members to select committees rests exclusively with the Speaker of the House.  *See* House Rule I.11 ("The Speaker shall appoint all select, joint, and conference committees ordered by the House."); 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (authorizing Speaker to "accept resignations and to make appointments authorized by law or by the House"); *see also* 8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172 (citing "[i]nstances in which the majority declined to recognize minority recommendations for committee assignments").

   House Resolution 503 is not to the contrary.  When creating the Select Committee, the House required only that Members be chosen "after *consultation* with the Minority Leader," H. Res. 503 § 2(a) (emphasis added), which provides the Speaker unilateral authority to appoint minority party Members after seeking input from the Minority Leader.  *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) ("consulting"

means to "seek[] advice or information of'" (internal quotation marks omitted)); *Consultation*, Black's Law Dictionary (11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone").

Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement, as it has in the past. *See* H. Res. 6, 116th Cong. § 104(f)(1)(B) (2019) (Select Committee on the Climate Crisis required that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader"); *id.* at § 201(b)(3) (same requirement for Select Committee on the Modernization of Congress). Similarly, had the House wanted to delegate appointment power directly to the Minority Leader, it could have done so, as it also has in the past. *See, e.g.*, H. Res. 24, 110th Cong. § 2(a) (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

Here, House Resolution 503 was followed: the Minority Leader *was* consulted, *see supra* at 4. The fact that the Speaker—using the authority provided to her by the House Rules; the January 4, 2021, Order of the House; and House Resolution 503—made different selections as to two Members, and that the Minority Leader withdrew his recommendations, does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.[21]

*Third*, Ms. Gionet argues that the Select Committee exceeded its authority in issuing the subpoena because "Chairman Thompson may only issue a subpoena upon consultation with the ranking minority member" yet "[t]he Select Committee has no Ranking Minority Members." Compl. ¶¶ 67-68. But as this Court has recognized, any consultation requirement in the

---

[21] Both courts that have considered the "consultation" argument that Ms. Gionet advances have rejected it. *See RNC*, 2022 WL 1294509, at *16; Order Den. Pl.'s Mot. for Prelim. Inj. at 9, *Eastman v. Thompson*, No. 22-99 (C.D. Cal. Jan. 25, 2022), ECF No. 43.

Resolution is satisfied by consultation with Vice Chair Cheney.  *See Bannon*, Mot. Hr'g Tr. at 117:10-118:5 (June 15, 2022); Mot. Hr'g Tr. at 130:22-131:24 (July 11, 2022); *see also RNC*, 2022 WL 1294509, at *16 (same).  Furthermore, that requirement applies only to subpoenas for depositions: "The chair of the Select Committee, upon consultation with the ranking minority member, may order *the taking of depositions*, including pursuant to subpoena."  H. Res. 503 § 5(c)(6)(A) (emphasis added).  The Subpoena here calls only for production of records; no deposition is involved.

## II.     The Subpoena Serves a Legislative Purpose and Is Not Overly Broad

Ms. Gionet claims that the subpoena is overbroad and serves no legislative purpose.  *See* Compl. ¶¶ 70-77 (including section title).  This claim, too, is incorrect.

Congress's broad power of investigation is firmly established.  The Supreme Court has confirmed that "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function."  *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).  "This power, deeply rooted in American and English institutions, is indeed co-extensive with the power to legislate."  *Quinn v. United States*, 349 U.S. 155, 160 (1955).  "Without the power to investigate . . . Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively."  *Id.* at 160-61.  This "broad" and "indispensable" power "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them."  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (internal quotation marks and citation omitted).

The January 6th attack did not materialize out of thin air.  It was the culmination of months of efforts to delegitimize the results of the Presidential election—an effort that began before the November 3, 2020, election even took place.  *See, e.g.*, Barton Gellman, *The Election*

*That Could Break America*, The Atlantic (Sept. 23, 2020).[22]  The Select Committee is investigating the relationship between the attack and the unprecedented efforts to undermine the election results.

House Resolution 503 established the Select Committee "[t]o investigate and report upon the facts, circumstances, and *causes* relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex . . . and relating to the interference with the peaceful transfer of power."  H. Res. 503 § 3(1) (emphasis added); *see also id.* § 4(a)(1).  As discussed above, *see supra* at 2-3, Mr. Gionet has extensive involvement in far-right social media, and reportedly had 16,000 viewers on his video feed while inside the Capitol on January 6th.  The Select Committee is investigating the role of right-wing extremist networks and "how . . . online platforms . . . may have factored into the motivation, organization, and execution of" the January 6th attack.  H. Res. 503 § 4(a)(1)(B).  The subpoena is thus appropriately focused on call detail records relating to phone numbers associated with Mr. Gionet during the three-month period involving the run-up to January 6th and its aftermath.[23]

## III.    The Subpoena Does Not Violate the First Amendment

Ms. Gionet's claim that the subpoena to Verizon violates the First Amendment (Compl. ¶¶ 52-61) is squarely foreclosed by *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 509-10 (1975).  There, the Supreme Court rejected an organization's argument that a Congressional subpoena's purpose was to "'harass, chill, punish, and deter' [it] in the exercise of [its] First

---

[22] *Available at* https://perma.cc/HW2H-YM5Q.

[23] Ms. Gionet suggests that the temporal scope of the subpoena must be overbroad because the FBI impounded her son's phones at the time of his arrest, which was prior to January 31.  *See* Compl. ¶ 60.  But an impounded phone can still receive incoming communications. And to the extent the phone was not involved in any communications at all during a specified time period, Ms. Gionet cannot suffer any injury.

Amendment rights," explaining that the typical First Amendment balancing test "plays no part" when a Congressional subpoena is involved.  *Id.* at 509 n.16.  Here, too, Ms. Gionet's First Amendment argument against enforcement of the Select Committee's subpoena must be rejected.

Even if this claim were subject to a balancing test, it would still fail: the requisite "balancing . . . of the competing private and public interests at stake," *Barenblatt v. United States*, 360 U.S. 109, 126 (1959), plainly favors the Select Committee here.  This Court has rejected claims that issuance of a Congressional subpoena violates a respondent's First Amendment rights.  *See Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 138 (D.D.C. 2016), *aff'd*, 856 F.3d 1080 (D.C. Cir. 2017).  That conclusion is entirely consistent with the Supreme Court's recognition that the public interest is extremely high when the focus is on ensuring the "free functioning of our national institutions."  *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (citation omitted).  The Select Committee is doing precisely that by seeking the records at issue here.

Ms. Gionet fails to assert any First Amendment interest that could outweigh the very grave public interest here.  That "[t]he phones were also used to engage in private conversations with friends and family," Compl. ¶ 56, does not distinguish this subpoena from a typical subpoena for call detail records, which would not expose the content of any such communications.  Nor does the allegation that Mr. Gionet used the phones to communicate with his attorneys, *see id.* ¶ 55, have any special First Amendment significance where, as here, the subpoena would not reveal the content of such communications.  *Cf. Wolff v. McDonnell*, 418 U.S. 539, 576-77 (1974) (rejecting First Amendment challenge to prison rule allowing guards to open legal mail, but only in presence of prisoner, because "the inmate's presence insures that

prison officials will not read the mail," and therefore would not "chill [attorney-client] communications").  Furthermore, Ms. Gionet lacks standing to bring claims on her adult son's behalf.  *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert h[er] own legal rights and interests, and cannot rest h[er] claim to relief on the legal rights or interests of third parties.").

Citing *Buckley v. Valeo*, 424 U.S. 1 (1976), Ms. Gionet appears to assert a First Amendment, freedom of association claim.  *See* Compl. ¶ 57.  But such an unsupported claim cannot succeed here.  *See Buckley*, 424 U.S. at 74 (reiterating that an associational injury requires demonstrating a "reasonable probability that the compelled disclosure . . . will subject them to threats, harassment, or reprisals from either Government officials or private parties"); *Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (reviewing case law and noting that courts have "emphasized in each of those decisions . . . the need for objective and articulable facts, which go beyond broad allegations or subjective fears . . . . [A] merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights").

Assuming for purposes of argument that Ms. Gionet could substantiate a legitimate interest implicated by the subpoena and that the Supreme Court's ruling in *Eastland* does not prevent her claim—neither of which is true here—that interest would be outweighed by the Select Committee's "uniquely weighty interest in investigating the causes and circumstances of the January 6th attack."  *Trump v. Thompson*, 20 F.4th at 35.  Here, the Select Committee's subpoena seeks records relevant to determining the root causes of the violent January 6th attack on Congress itself and the constitutional responsibility to officially count Presidential electoral votes.  To determine the extent of the efforts by Mr. Trump and his allies to overturn the election

results and interfere with the peaceful transfer of power, the Select Committee requires a record of relevant communications.  This is a paradigmatic example of the weighty governmental interest in the "free functioning of our national institutions."  *Buckley*, 424 U.S. at 66 (citation omitted).  Accordingly, Ms. Gionet's First Amendment claim fails.

IV.   **The Subpoena Does Not Violate the Fourth Amendment**

Ms. Gionet's claim that the allegedly "sweeping" subpoena violates the Fourth Amendment (Compl. ¶¶ 42-48) is mistaken.  A subpoena is not impermissibly overbroad under the Fourth Amendment if its call for documents or testimony is within the scope of the Congressional inquiry at issue.  *See McPhaul v. United States*, 364 U.S. 372, 382 (1960).  The Select Committee's inquiry includes examining the January 6th attack as well as its "circumstances" and "causes," to inform a consideration of "changes in law, policy, procedures, rules, or regulations."  H. Res. 503 §§ (3)(1), 4(c).  Given that scope, the subpoena is appropriately tailored to meet the Select Committee's mandate and is far from "a sweeping subpoena untethered from any valid legislative purpose."  Compl. ¶ 48.  *See also Eastland*, 421 U.S. at 509.  And because the seeds of the January 6th attack appear to have been planted months earlier, it is entirely appropriate to examine records dating back to November 2020, when the election occurred.  *Cf.* Order Re Privilege of Docs. Dated Jan. 4-7, 2021 at 3-5, *Eastman v. Thompson*, No. 22-99 (C.D. Cal. Mar. 28, 2022), ECF No. 260.

Ms. Gionet improperly relies on the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  *See* Compl. ¶¶ 44, 47.  *Carpenter*, by its own terms, does not apply to the records the subpoena seeks.  In that case, the Supreme Court faced the question of whether the Government's collection of historical cell-site location information ("CSLI") from a third-party telecommunications company constituted a "search" under the Fourth Amendment.  *See* 138 S. Ct. at 2211.  The Court had previously held in *Smith v. Maryland*, that recording the

17

numbers that a particular phone number dialed did not constitute a search because, among other reasons, such records were voluntarily disclosed to the phone company and thus there was no reasonable expectation of privacy in them.  *See* 442 U.S. 735, 743-44 (1979).

In *Carpenter*, although historical CSLI data was in the possession of a third-party telecommunications company, the Court "decline[d] to extend" *Smith* to historical CSLI, "[g]iven the unique nature of cell phone *location* records" and their ability to "achieve[] near perfect surveillance."  *Carpenter*, 138 S. Ct. at 2217-18 (emphasis added).  In particular, the Court distinguished historical CSLI from the "limited capabilities of a pen register," which consisted of "telephone call logs [that] reveal little in the way of 'identifying information.'"  *Id.* at 2219 (citation omitted).

The Verizon subpoena at issue here seeks only subscriber information, connection records, and records of session times and durations.  *See* Ex. A.  It does not seek historical CSLI or the contents or substance of any communications.  *See id.*  The records sought by the Select Committee, therefore, are governed squarely by *Smith*, not *Carpenter*.  *See Carpenter*, 138 S. Ct. at 2210 (stating that decision is a "narrow" one that "does not disturb the application of *Smith*").

Courts addressing suppression motions after *Carpenter* have consistently held that the decision does not apply to the kinds of records sought here, such as subscriber information and call-detail records.  *See, e.g.*, *United States v. Beverly*, 943 F.3d 225, 239 (5th Cir. 2019) (holding *Carpenter* does not apply to subscriber information and call-detail records, and declining to assume that such records may be used to track location); *United States v. Searcy*, No. 19-135, 2021 WL 3616062, at *5 (W.D. Pa. Aug. 16, 2021) ("Except for CSLI . . . Mr. Searcy has no legitimate expectation of privacy in information he voluntarily turns over to third parties[.]" (internal quotation marks and citation omitted)); *Brown v. Sprint Corp. Sec. Specialist*,

No. 17-CV-2561, 2019 WL 418100, at *4 (E.D.N.Y. Jan. 31, 2019) (holding *Carpenter* does not apply to subscriber and call-detail records).

Thus, *Carpenter* simply does not apply to the third-party Verizon subpoena here, and the Verizon subpoena does not violate Ms. Gionet's Fourth Amendment rights.  Judge Kelly reached the same conclusion in *RNC*, in which the plaintiff had argued that *Carpenter* applied.  *See* 2022 WL 1294509, at *23-24; *see also* Mem. P. & A. in Supp. of Pl.'s Mot. for Prelim. Inj. at 14, *RNC*, No. 22-659 (Mar. 15, 2022), ECF No. 8; Reply Mem. P. & A. in Supp. of Pl.'s Mot. for Prelim. Inj. at 13, 15-16, *RNC*, No. 22-659 (Mar. 29, 2022), ECF No. 21.  Judge Kelly applied *McPhaul*, and concluded that "the subpoena is not more sweeping than the one sustained against challenge in *McPhaul*," and thus "the Court cannot say that the breadth of the subpoena is such as to violate the Fourth Amendment."  2022 WL 1294509, at *24 (internal quotation marks, alteration, and citation omitted).

## V.   The Subpoena Does Not Violate Attorney-Client Privilege[24]

As a threshold matter, Ms. Gionet alleges only that her adult son used the phone numbers in question to communicate with his attorney.  See Compl. ¶¶ 49-51, 55.  As noted above, see supra at 16, Ms. Gionet lacks standing to raise claims on his behalf.

In any event, the attorney-client privilege does not protect the non-content information that the subpoena here seeks.  The attorney-client privilege "protects from disclosure confidential communications from clients to their attorneys, as well as communications from attorneys to their clients containing confidential information supplied by the client."  *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 346-347 (D.D.C. 2018).  The Verizon subpoena seeks only subscriber information and connection records; it does not seek the content of any

---

[24] The Complaint also alleges that "the Select Committee seeks to violate . . . marital privilege," Compl. ¶ 2, but alleges no facts relevant to such a claim.

communications.  *See supra* at 18.  The mere fact that a communication occurred, and the identity of the participants in that communication, are not privileged—after all, such information is regularly disclosed in privilege logs used to support a privilege claim.  *See, e.g.*, *Dir. of Off. of Thrift Supervision v. Ernst & Young*, 795 F. Supp. 7, 13 (D.D.C. 1992).

## VI.   The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from Verizon Pursuant to a Lawful Subpoena

Ms. Gionet asserts (Compl. ¶¶ 78-83) that the Select Committee's subpoena to Verizon violates the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq*.  But nothing in that Act limits the ability of a Congressional committee to obtain non-content information from a "person or entity providing an electronic communication service to the public" via a lawful, duly authorized subpoena.  18 U.S.C. § 2702(a)(1).

The Stored Communications Act generally allows disclosure of non-content records, although it prohibits (with one exception) voluntary disclosure of non-content records to "governmental entit[ies]."  *Id.* § 2702(a)(3), (c)(4).  The definition of the term "governmental entity," as used in the Act, does not include Congress.  *Id.* §§ 6, 2711(4).  And the Act expressly *permits* disclosure to "any person other than a governmental entity."  *Id.* § 2702(c)(6).

The statute's definitional terms make clear that Congress did not intend for the phrase "governmental entity" to include Congress.  *See Digit. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) ("'When a statute includes an explicit definition, we must follow that definition,' even if it varies from a term's ordinary meaning." (citation omitted)).  The Act defines "governmental entity" as "a department or agency of the United States or any State or political subdivision thereof."  18 U.S.C. § 2711(4).  The terms "department" and "agency" have particular meanings in Title 18, as defined in Section 6.  That provision defines "department" as "one of the *executive* departments enumerated in section 1 [now § 101] of Title 5, unless the

context shows that such term was intended to describe the executive, legislative, or judicial branches of the government." *Id.* § 6 (emphasis added). It likewise defines "agency" as "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense." *Id.* The Select Committee is neither an executive department nor a governmental agency, and no "context" in the Stored Communications Act suggests that those terms apply to Congress.

The Supreme Court addressed a similar issue of statutory interpretation regarding the phrase "any department or agency of the United States" in *Hubbard v. United States*, 514 U.S. 695, 704 (1995). That case concerned the applicability of 18 U.S.C. § 1001, forbidding making false statements to "any department or agency of the United States," to the Judicial Branch. *Id.* at 698. The Court noted initially that the definitions in Section 6 presumptively applied to "all of Title 18," including Section 1001. *Id.* at 700. The Court stated it was "incontrovertible" that "agency" did not refer to any court within the Judicial Branch. *Id.* The Court further concluded that nothing in the context of Section 1001 "shows that" the term "department" was intended to apply beyond the Executive Branch. *Id.* (quoting 18 U.S.C. § 6). The Court stated that there is "nothing in the text of the statute, or in any related legislation, that even suggests—let alone 'shows'—that the normal definition of 'department' was not intended." *Id.* at 701.[25]

---

[25] *Hubbard* overruled *United States v. Bramblett*, 348 U.S. 503 (1955), which held that the statute applied to false statements made to the Legislative Branch. 514 U.S. at 715. The *Hubbard* Court stated that *Bramblett* "erred by giving insufficient weight to the plain language of §§ 6 and 1001," resulting "in a decision that is at war with the text of not one, but two different Acts of Congress." *Id.* at 702, 708. After the ruling in *Hubbard*, Congress amended the statute at issue, 18 U.S.C. § 1001. *See* False Statements Accountability Act of 1996, Pub. L. No. 104-292, § 2, 110 Stat. 3459.

As in *Hubbard*, the Act's definition of "governmental entity" and the definition contained in Section 6 make plain that the term "governmental entity" does not apply to Congress.  There is nothing in the Act that even suggests, let alone "shows," that Congress intended to include itself in the definition.  Moreover, the statute contains other provisions that further reinforce this plain meaning.

The Act provides that, in the case of willful or intentional violations, the "head of the department or agency" in which the violation occurred may subject the violator to administrative discipline.  18 U.S.C. § 2712(c).  But the leadership of Congress and its committees do not constitute a "head" of an agency or department.  As the Supreme Court long ago established, "[t]he term 'head of a department' means . . . the Secretary in charge of a great division of the *executive branch* of the government, like the State, Treasury, and War, who is a member of the Cabinet."  *Burnap v. United States*, 252 U.S. 512, 515 (1920) (emphasis added) (citation omitted); *see also Trump v. Deutsche Bank AG*, 943 F.3d 627, 642 (2d Cir. 2019) (holding that use of term "head of the agency or department" indicated Congress did not intend Right to Financial Privacy Act to apply to Congressional committee), *vacated on other grounds by Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020); *see also* Aaron R. Cooper, *Congressional Surveillance*, 70 Am. U. L. Rev. 1799, 1825-34 (2021) (surveying statutory text, context, and legislative history and concluding that in the Stored Communications Act Congress intended to exempt itself from the term "governmental entity").

Accordingly, the plain text of the Stored Communications Act, as well as the overall context and structure of the statute, make clear that Congress is not a "governmental entity" as that term is defined in the Act.  As a result, because the Act expressly permits disclosure of non-

content records to "any person other than a governmental entity," 18 U.S.C. § 2702(c)(6), the

statute cannot be read to prohibit their disclosure to the Select Committee.

## CONCLUSION

For the reasons stated above, this Court should dismiss the Complaint in its entirety.

Respectfully submitted,

/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

John A. Freedman[*]
Paul Fishman[*]
Amy Jeffress[*]
David J. Weiner[*]
John M. Hindley[*]
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com
David.Weiner@arnoldporter.com
John.Hindley@arnoldporter.com

SHER TREMONTE LLP
Justin M. Sher[*]
Michael Tremonte[*]
Noam Biale[*]
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor

23

New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

Dated: August 31, 2022

* Appearing pursuant to 2 U.S.C. § 5571(a).

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter*
Douglas N. Letter
